STATE, EX REL. CLARENCE A. DAVIS, ATTORNEY GENERAL, APPELLEE, V. FARMERS STATE BANK OF HALSEY, APPELLEE: COMMERCIAL SAVINGS BANK OF DES MOINES ET AL., INTERVENERS, APPELLANTS.

FILED NOVEMBER 16, 1923. No. 23053.

1. **Banks and Banking:** LOANS TO OFFICERS. Under section 8012, Comp. St. 1922, an officer or employee of a banking corporation is not permitted to borrow money from the bank, either directly or indirectly.

2. ———: ———: DEPOSITS. Where an officer of a bank presents a note of a third party payable to the bank, and takes therefor certificates of deposit issued to himself, and where the circumstances of the transaction indicate that it was a mere device on the part of the officer to obtain a loan to himself by selling the certificates, such certificates are not deposits within the protection of the guaranty law.

3. ———: GUARANTY FUND: DEPOSITS. In order to create a deposit which will be protected by the guaranty law, as the term "deposit" is understood in section 8033, Comp. St. 1922, it is necessary that money or its equivalent shall in intention and effect be placed in or at the command of the bank under circumstances which do not transgress specific limitations of the bank guaranty law.

4. ———: ———: ———. Where an officer of the bank, for the ostensible purpose of bolstering up the cash reserve of the bank, has issued to himself certificates of deposit, nothing being put into the bank therefor, and where such certificates are acquired by a purchaser in due course, the transaction of the issuance of

the certificates is not a deposit within the meaning of the guaranty law, nor entitled to the protection of the guaranty fund.

5. ———: ———: ———. Where two certificates of deposit for $1,000 each are issued to an officer of the bank, bearing 5 per cent. interest, for the ostensible purpose of bolstering up the cash reserve of the bank, nothing being put into the bank at the time, and later the certificates are acquired by a purchaser in due course, the officer then paying to the bank $1,980 for such certificates, such transaction will not be considered as a deposit within the meaning of the guaranty law, the effect of the transaction being that a greater rate of interest than 5 per cent. was paid on the certificate by the bank, which is prohibited by section 8008, Comp. St. 1922.

APPEAL from the district court for Thomas county: EDWIN P. CLEMENTS, JUDGE. *Affirmed.*

*Stough & Dunn, Dale & Harvison,* and *Edwin F. Myers,* for appellants.

*O. S. Spillman, Attorney General,* and *Harry Silverman, contra.*

Heard before MORRISSEY, C. J., LETTON, DEAN, DAY and GOOD, JJ., REDICK, District Judge.

DAY, J.

In an action, styled State of Nebraska, ex rel. Clarence A. Davis, Attorney General, v. Farmers State Bank of Halsey, Nebraska, hereinafter designated the Nebraska Bank, a receiver was duly appointed who was proceeding to wind up the affairs of the Nebraska bank in the manner provided by law.

Five banks, the Commercial Savings Bank of Des Moines, Iowa, hereinafter called the Des Moines Bank, the Farmers Exchange bank of Grafton, Iowa, hereinafter referred to as the Grafton Bank, the Farmers and Merchants Savings Bank of Manley, Iowa, hereinafter called the Manley Bank,

VOL. 111]     SEPTEMBER TERM, 1923     119

, State, ex rel. Davis, v. Farmers State Bank.

the First National Bank of Nora Springs, Iowa, hereinafter called the Nora Springs Bank, and the Security Bank of Caddo, Texas, hereinafter called the Texas Bank, intervened in said action and prayed that their respective claims against the Nebraska Bank, which were evidenced by certificates of deposit, be established as valid claims against the Nebraska Bank and its receiver, with the right of recourse to the guaranty fund in case it be found that the general assets of the Nebraska Bank were insufficient to pay the respective claims.

The trial court found, and entered judgment accordingly, that the interveners respectively were purchasers of their several claims in due course, and that the several certificates of deposit were general obligations of the Nebraska Bank, but denied the several interveners recourse to the guaranty fund for payment of their respective certificates. From this judgment each of the interveners named have separately appealed.

All of the certificates referred to were issued by the Nebraska Bank, and properly signed. The Des Moines Bank is the owner and holder of certificates Nos. 23, 24, and 25, each for $1,000. The Grafton Bank is the owner and holder of certificate No. 31 for $1,000. The Manley Bank is the owner and holder of certificates Nos. 40 and 41, each for $1,000. The Nora Springs Bank is the owner and holder of certificates Nos. 26, 27, 28, and 32, each for $1,000. The Texas Bank is the owner and holder of certificates Nos. 51, 53, 54, 55, and 56, each for $1,000.

The important question presented by this appeal is whether resort may be had to the guaranty fund for the payment of the several certificates.

The record shows that the Nebraska Bank was a duly organized state bank with a capital stock of $10,000, and was conducting a banking business at Halsey, Nebraska. Sometime prior to May 29, 1919, R. Earle Capron, a resident of Minneapolis, Minnesota, acquired 53 shares of the capital stock in the Nebraska Bank, and arranged with E. N. Dion, a young man without banking experience, to

conduct the bank and become its cashier. Under Capron's direction Dion went to Omaha, where he met B. Vedeler, who, for the purposes of the transaction, was Capron's representative, and together they proceeded to Halsey, arriving there on the morning of May 29, 1919. The shares of stock purchased by Capron were transferred on the books of the bank, five shares being issued to Dion. A meeting of the stockholders was held, followed by a meeting of the board of directors, at which Capron was elected president, and Dion cashier, and the business of the bank was turned over to Dion. In the afternoon of May 31, 1919, Vedeler presented a letter to Dion, purporting to have been written and signed by Capron, inclosing two notes, each for $2,000, dated May 27, 1919, and payable to the Nebraska Bank. Attached to each note were four certificates of stock of the Great Western Live Stock Company, each for $500. The notes were signed, respectively, H. D. Haggerty, and Warren H. Reck. The letter directed Dion to put the notes in the bank, and to issue to Capron therefor four certificates of deposit for $1,000 each. Dion, being ignorant of banking affairs, did not know how to make the proper entries in the books, and was assisted in this respect by Vedeler. Accordingly Dion issued certificates of deposit Nos. 21, 22, 23, and 24 to Capron, and delivered them to Vedeler. Certificates Nos. 21 and 22 were payable in three months, and were paid at maturity. Certificates Nos. 23 and 24 were payable in six months from date. These four certificates, together with No. 25, which will be hereinafter referred to, came into the possession of the Des Moines Bank, in due course of business. On the morning of June 5, 1919, Capron and F. M. Ridings appeared at the Nebraska Bank, and informed Dion that Ridings had purchased Capron's stock in the bank. A transfer of the shares of stock was made on the books, a directors' meeting held, and Ridings was elected president, and left town at 2 o'clock the same day. Before leaving, Ridings produced four notes, each for $2,000, attached to each of said notes being $2,000 of stock in the Great Western Live Stock Company. Rid-

ings instructed Dion to enter the notes with the bills receivable, and to issue therefor eight certificates of deposit, each for $1,000, payable to Ridings. Dion obeyed the direction of the new president and issued the certificates. One of the notes, signed by V. C. Haggerty, was payable to the Citizens State Bank of Bathgate, North Dakota, and indorsed: "Pay Farmers State Bank, Halsey, Neb. Without recourse. Citizens State Bank, F. M. Ridings, Pres." One of the notes was signed "Great Western Live Stock Company, by F. M. Ridings, Sec'y & Treas.," was payable to H. D. Haggerty, Incorporated, and indorsed: "Pay to the order of Farmers State Bank, Halsey, Nebraska, H. D. Haggerty, Incorporated, by F. M. Ridings, Sec'y & Treas." One of the notes was signed Warren H. Reck, and payable to Farmers State Bank of Halsey. One of the notes was signed by T. W. Jewell, payable to Farmers Savings Bank and indorsed: "Farmers Savings Bank, Plymouth, Ia. R. Earle Capron, Cashier." Capron and Ridings were present in the bank when Dion wrote the eight certificates, which were handed to Ridings. The certificates issued to Ridings June 5, 1919, were Nos. 25, 26, 27, 28, 29, 30, 31, and 32, each for $1,000. On July 30, 1919, Dion received a letter from Ridings directing him to send five certificates of deposit for $1,000 each for the purpose of raising money to bolster up the cash reserve of the bank. Accordingly Dion issued certificates Nos. 40, 41, 42, 43, and 45, payable to the order of Ridings. No notes were placed in the bank covering this transaction. No money was ever received by the bank for the certificates issued to Ridings July 30. About October 1, 1919, Dion received a letter from Ridings requesting him to send ten certificates of deposit, payable to the latter, for $1,000 each, stating that he had a place to put them. Instead of sending the certificates, Dion took a pad of blank certificates and went to Minneapolis. There he met Ridings and Vedeler. After some conversation, in which Vedeler stated that he could place ten certificates in a Texas Bank, Dion, at the direction of Ridings, issued ten certificates, each for $1,000, payable to Ridings, and delivered the same

to him. The purpose of this, as disclosed by the conversation, was to obtain money to bolster up the cash reserve of the bank. The certificates were issued, dated October 4, 1919, and were Nos. 47, 48, 49, 50, 51, 52, 53, 54, 55, and 56. Nothing was put in the bank for these certificates. On October 15, 1919, Vedeler sent $1,980 to the bank for certificates Nos. 51 and 53.

Each of the five appellants insists that because the certificates of deposit are negotiable instruments, and were acquired by the respective holders in due course, therefore they are entitled to recourse to the guaranty fund for ultimate payment.

In this contention we think the appellants fail to distinguish between the liability of the maker of a negotiable instrument, which rests upon the law pertaining to negotiable paper, and the liability of the guaranty fund, which is purely statutory. The circumstances under which the guaranty fund may be liable are entirely apart from the law pertaining to negotiable paper. A holder of a certificate of deposit in a bank who seeks to hold the guaranty fund liable for its payment must show that the transaction leading up to the issuance of the certificate was such that the law holds the guaranty fund liable for its payment. The mere fact that a certificate recites on its face that a certain sum has been deposited, or that officers of the bank may have stated that the deposit is protected by the guaranty law, does not make the guaranty fund liable for payment, if in fact a deposit has not been made, as that term is understood in the guaranty law. The banks have nothing to do with the guaranty fund as such. It is a fund raised by assessments against all state banks, administered by officers of the state to protect deposits in banks. Section 8033, Comp. St. 1922, relating to the guaranty fund, provides in substance that claims of depositors for deposits shall have priority over all other claims, with certain exceptions not necessary to be noted; and where the cash in the hands of the receiver available for the payment of depositors is insufficient to pay such claims, the court having jurisdiction of

the receivership shall ascertain the amount required to supply the deficiency, and shall certify the amount required to supply the deficiency to the department of trade and commerce, which shall draw against the guaranty fund in the amount required, and transmit the same to the receiver to be applied on the claims of depositors. From this language it is clear that the legislature intended that the guaranty fund should be liable only for claims of depositors for deposits. What is meant, then, by the term "deposits," as used in the guaranty law? It is not easy to frame a definition which will meet all the situations which may arise in business affairs. In *State v. Banking House of A. Castetter*, 110 Neb. 564, it was said, quoting from *Fourth Nat. Bank v. Bank Commissioner*, 110 Kan. 380: "Speaking generally, to create a deposit, within the meaning of the statute, money or the equivalent of money must in intention and effect be placed in or at the command of the bank, under circumstances which do not transgress specific limitations of the bank guaranty law." In *Iams v. Farmers State Bank*, 101 Neb. 778, the claimant Iams was the holder of a certificate of deposit issued to him by the bank, regular on its face, and providing for the payment of interest at 5 per cent. The statute limits the amount of interest a bank can pay on certificates of deposit to 5 per cent. Comp. St. 1922, sec. 8008. Iams had a secret agreement by which he was to secure 6 per cent. It was held that the transaction was not a deposit within the meaning of the bank depositors' guaranty act. Section 8012, Comp. St. 1922, in force at the time of the transactions, provides in substance that no officer of a corporation transacting a banking business shall be permitted to borrow any of the funds of the bank, directly or indirectly. A severe penalty is attached to the violation of the law.

We come now to consider the transactions which led up to the issuance of the certificates to Capron on May 31, 1919, and to Ridings on June 5, 1919.

As before stated, within two days after Capron became president of the bank, he presented to the bank, through

his agent Vedeler, the notes of Haggerty and Reck, and had issued to himself certificates Nos. 21, 22, 23, and 24. A week later Capron transferred his interest in the bank to Ridings, who was elected president, and, within four hours, Ridings presented notes to the bank and had issued to himself certificates Nos. 25, 26, 27, 28, 29, 30, 31, and 32. If in good faith the makers of the several notes had borrowed the money from the bank, and in turn lent or given it to Capron and Ridings, who deposited it in the bank and took certificates therefor, there would be nothing in the transaction prohibited by law. But the circumstances of the transactions by which Capron and Ridings obtained the certificates brand the transactions as mere subterfuge to obtain for themselves a loan from the bank, a thing prohibited by law. Here we have men in a distant city executing their notes to a bank, all of which were secured by stock in a corporation in which Ridings was an officer, and one of the makers was president. The certificates were issued, not to the makers of the notes, but to a stranger, a fact in itself out of the ordinary. The makers of the notes and Capron and Ridings are shown to be associated in a number of business transactions. While the evidence is not entirely clear, part of it being stricken out after it was given, we think it fairly appears that the notes were given as accommodation, with no thought that payment would ever be demanded. There is some testimony in the record which tends to show that the notes have some considerable value, but, as we view it, it is entirely immaterial whether the notes are collectable or otherwise. The statute in direct terms prohibits an officer of a bank from borrowing its money, directly or indirectly, regardless of the amount or value of the security which may be given. A thorough examination of the record convinces us that the transactions of Capron and Ridings on May 31 and June 5, respectively, were but cunningly devised schemes to obtain loans from the bank. It was an attempt to evade the law. That the issuance of the certificates to them was not a good faith

State, ex rel. Davis, v. Farmers State Bank.

deposit as that term is understood in the guaranty law seems clear.

As was said in the *Iams* case, *supra*: "The act creating the depositors' guaranty fund was intended by the legislature to be a shield of protection against loss to those who in good faith deposit their money in state banks in compliance with the terms of the statute. Unless its provisions are fairly construed and impartially enforced, this salutary law might become a destructive sword in the hands of unscrupulous persons having unlawful designs on the depositors' guaranty fund."

Referring now to the transactions out of which certificates Nos. 40 and 41, held by the Manley Bank, and certificates Nos. 51, 53, 54, 55, and 56, held by the Texas Bank, were issued, there is no pretext that anything was ever put into the bank for their issuance, except for certificates Nos. 51 and 53, which will be considered later. The certificates were issued to Ridings upon the claim on his part that they would be sold and the money placed in the bank to bolster up the cash reserve of the bank. It needs no argument to show that such a transaction is illegal, and that the certificates of deposit so issued cannot be regarded as deposits within the protection of the guaranty law. But, it is argued, as to certificates Nos. 51 and 53, that the bank received $1,980 in payment therefor, and that they should be protected by the guaranty law. The record shows that some ten days after the certificates were issued the bank received $1,980 for certificates Nos. 51 and 53. This fact, however, would not render the certificates deposits within the protection of the guaranty act. Reduced to its simplest terms, the transaction would be this: The bank receives $1,980 and issues therefor two certificates of deposit for $1,000 each, bearing interest at 5 per cent. The effect of such a transaction would be to enable the holder to obtain a greater rate of interest on his certificate than 5 per cent., which is prohibited by law. In principle the transaction is within the rule announced in the *Iams* case, heretofore cited.

The argument is made by appellants that, they being

owners of the several certificates of deposit, therefore, they were "holders of exchange," and entitled to priority over other claims, as provided by section 8033, Comp. St. 1922. This contention, in so far as it seeks to hold the guaranty fund liable, is, we think, without merit. The term "holders of exchange" as used in this section relates to those transactions where money or its equivalent has been deposited in the bank and a bill of exchange upon some other bank has been issued in lieu thereof.

Other suggestions have been made in the brief which we do not deem it necessary to answer, but which have been considered.

From an examination of the record in the light of the principles of law which must be applied, we are satisfied that the present holders of the certificates are not entitled to recourse to the guaranty fund for their payment. They were issued in violation of law, and cannot be considered as deposits within the meaning of that term as used in the guaranty law.

We conclude that the judgment of the trial court was right in every particular, and it is, therefore,

AFFIRMED.

MORRISSEY, C. J,. dissents.