STATE, EX REL. O. S. SPILLMAN, ATTORNEY GENERAL, V. FIRST STATE BANK OF RICHFIELD: R. O. BROWNELL, RECEIVER, APPELLEE: SAMUEL A. SNIDER, INTER-VENER, APPELLANT.

FILED JULY 2, 1928. No. 26076.

*William Baird & Sons,* for appellant.

*Crossman, Munger & Barton, contra.*

Heard before ROSE, DEAN, GOOD, THOMPSON and EBERLY, JJ., and REDICK, District Judge.

REDICK, District Judge.

This is a proceeding by the claimant, Samuel A. Snider, seeking the allowance against and payment from the depositors' guaranty fund of his claim as a holder of exchange issued by the First State Bank of Richfield, an insolvent. The Richfield bank was taken over by the department of trade and commerce September 1, 1926, and a receiver therefor appointed September 30 following. Intervener filed the claim in usual course, and same was allowed as a general claim against the bank, but refused payment from the guaranty fund by the district court, and claimant appeals.

The objections of the receiver to the allowance of the claim against the guaranty fund may be summarized as follows: That the Richfield bank received neither money nor its equivalent, nor was any fund or thing of value placed on deposit in, or at the command of, said bank in

consideration for the bill of exchange in question; that the intervener and the First National Bank of Osceola, through which he claims, negligently paid a certain check for $4,750, referred to later; and that the depositors' guaranty fund did not profit or benefit in any way by the transaction resulting in the issuance of the exchange in question.

Most of the facts are stipulated and the remainder are not in dispute. One E. C. Goerke and Charles Marshall were owners of the majority of the stock in the Richfield bank of which Goerke was president, and also of the State Bank of Papillion of which Goerke was president and Marshall cashier. June 26, 1926, Goerke drew his check for $5,000 on the Richfield bank (in which he had to his credit only $3.14), payable to Samuel A. Snider, president of the First National Bank of Osceola, Nebraska, who indorsed and deposited it in the Osceola bank to the credit of Goerke on June 28, 1926, and the same day it was sent for collection to the United States National Bank at Omaha, and by it to the Federal Reserve Bank, Omaha branch, which presented it for payment, together with two small items aggregating $68.80, not in controversy herein, to the Richfield bank by a cash letter July 1. The Richfield bank in payment, on July 1, issued its draft payable to the Federal Reserve Bank upon the Union State Bank of Omaha for $5,068.80, which is the bill of exchange involved in this proceeding. Prior to the presentation of this bill to the Union State Bank on July 3, payment was stopped by the Richfield bank by notification from Graham, its cashier. Thereupon the amount of said draft was charged back by the Federal Reserve Bank to the United States National Bank and by the United States National to the First National Bank of Osceola, which charged the same to the account of claimant, Snider, and it was paid by him, and he is now the holder of said draft.

The Richfield bank and Papillion bank were located about five miles apart. On June 30, 1926, Paul N. Graham, cashier of the Richfield bank, called at the Papillion bank

and was notified by Goerke that an item of $5,000 would appear against him that day in the Richfield bank, and Goerke as president thereupon drew a draft of Papillion bank on the Union State Bank of Omaha payable to the Richfield bank for $5,000, dated July 1, and delivered the same to Graham for the purpose of taking care of Goerke's check, Graham returned to Richfield, and on the following morning the Goerke check was presented, as above stated, and the bill in controversy issued. This draft of the Papillion bank was not credited to Goerke by the Richfield bank as a deposit, but was substituted for the Goerke check to Snider upon payment thereof. Late in the afternoon of July 2 Graham again called at the Papillion bank and found the same in the hands of the department of trade and commerce with bank examiners auditing the books. Goerke had disappeared the evening before and is now a fugitive from justice. At this time Graham was informed by the agent of the department of trade and commerce that the $5,000 draft which Goerke had given to the Richfield bank was fraudulent and without consideration, and that payment thereon had been stopped, and advised Graham to stop payment on the draft of the Richfield bank issued in payment of Goerke's check, which was done by Graham that evening by telegraph to the Union State Bank. Payment was stopped on the Goerke draft July 2, and the same has never been paid.

June 29, 1926, Goerke drew his check in favor of C. E. Marshall on the First National Bank of Osceola for $4,750 upon his credit set up by his previous check on the Richfield bank. This check was indorsed by Marshall and sent to the Union State Bank for the account of the Papillion bank, which was credited therewith. Thereupon the Union State Bank forwarded said check for collection to the First National Bank of Omaha which in turn cleared to the Federal Reserve Bank in Omaha, and it later mailed the same to the Osceola bank. The latter received the check, charged Goerke's account with the same, and remitted the amount thereof to the Federal Reserve Bank by draft on

the United States National, which paid the same and charged the bank. The claimant received assignments of the bill of exchange in controversy from the Federal Reserve Bank and the Osceola bank and is now the holder of the same.

The $4,750 item credited to the Papillion bank by the Union State Bank was paid and remained there, never having been withdrawn. On June 29, 1926, the Papillion bank had to its credit in Union State Bank $10,770.59; on June 30, $13,608.76; July 1, $9,288.59; and on July 2, $8,288.71. On July 3 the Union State Bank applied the sum of $8,288.71, which included the item of $4,750, upon bills payable to the Union State Bank from the Papillion bank.

The Papillion bank was taken over by the department of trade and commerce on July 3, 1926, and receiver appointed therefor July 6. It has never been determined as a fact whether the $5,000 draft drawn by Goerke in favor of the Richfield bank was fraudulent as against the Papillion bank or not; but it appears that the receiver of the latter is unable to discover from an examination of the books of the bank any consideration therefor. The fact remains, however, that out of these transactions the Papillion bank received credit with the Union State Bank to the extent of $4,750, which was applied in reduction of its indebtedness to that bank. Whether or not Goerke's draft was a fraud upon the Papillion bank, which seems quite probable, it is not claimed that Graham, cashier of the Richfield bank, the claimant, or the Osceola bank, was a party thereto or had any notice thereof; neither is it claimed that they had any knowledge of the failing condition or insolvency of the Papillion bank.

The crucial question for determination in this case is whether or not the Richfield bank, in consideration for the bill of exchange in controversy, "received money or its equivalent, or any fund or thing of value placed on deposit in, or at the command of, said bank in intention or effect," thereby entitling said bill to payment from the

guaranty fund. It has been held time and again in this state that these conditions must be present in the case of a deposit in order that the same may be properly charged against the guaranty fund; and holders of exchange are subject to the same conditions. As was said in *State v. Farmers Bank of Halsey,* 111 Neb. 117: "The term 'holders of exchange' as used in this section relates to those transactions where money or its equivalent has been deposited in the bank and a bill of exchange upon some other bank has been issued in lieu thereof."

The claimant contends that the draft of the Papillion bank signed by Goerke, president, and drawn upon the Union State Bank, in which the Papillion bank had sufficient funds to meet the draft, was the equivalent of money, within the meaning of the statute; while the receiver insists that because it does not appear that the Papillion bank received any consideration for the draft, and because the transaction was an attempt on the part of Goerke to defraud the Papillion bank, the whole transaction was tainted, and to allow the claim would be fraud upon the guaranty fund.

It was said by Letton, J., in *State v. American State Bank,* 112 Neb. 182, at page 186: "The transaction must be considered as it appeared to the parties at that time, and not as subsequent events may have changed the situation. That which would be good judgment under normal circumstances may prove to have been unwise in the light of extraordinary or unusual subsequent events, such as periods of unlooked-for financial depression." We think this is a correct statement of the law, and that in determining the problem before us we must consider the facts and circumstances as they existed on July 1, 1926, the date when the draft in question was issued, unaffected by what may have occurred subsequently. We have held that a check, equivalent to money for banking purposes, if accepted by a bank as the consideration for a time certificate of deposit, may amount to a deposit within the meaning of the bank guaranty law. *State v. South Fork State*

*Bank,* 112 Neb. 623. We find little difficulty in holding that the draft of the Papillion bank drawn by its president upon the Union State Bank, which had in its hands sufficient funds for payment, constituted, on July 1, an equivalent of money deposited in or received by the Richfield bank, in consideration for the issuance of its draft in payment of Goerke's check to Snider. But for the failure of the Papillion bank on July 2, an occurrence entirely beyond the control of any of the other parties to the transaction, the draft of the Papillion bank would, in all human probability, have been paid; but whether it would have been paid or not, at the time of its issuance the Papillion bank was a going concern and had to its credit in Union State Bank sufficient funds to cover. We fail to perceive how the failure of the Papillion bank, taking it over by the department of trade and commerce, and stopping payment of the draft could affect the rights of the holder of the draft which were fixed at the date of its issuance. None of the parties to this proceeding were connected with or had any knowledge of the fraud of Goerke, if one was attempted, and the transaction upon its face had all the appearance of a legitimate banking transaction. The fact that in the end, because of matters beyond its control, the Richfield bank never received the proceeds of the draft is not determinative of the question. It may easily happen that, through mistake of judgment or as the result of unforseen circumstances or unavoidable casualty, a transaction entered upon in good faith and for full value may result in a loss; but this would not ordinarily affect the rights of innocent third parties. It frequently happens that a note which is considered perfectly good at the time, discounted by a bank, is not paid when due and results in a loss; but this would not prevent the depositor of the proceeds of the discount from being protected by the guaranty fund. If, at the time the draft in question was issued, the holder was under the protection of the bank's guaranty fund, the subsequent acts of third parties resulting in loss would not release the fund from liability.

We think the receiver places too much stress upon the fact of the intention of Goerke to commit a fraud. It may be that the Papillion bank, by reason of such fraud, might escape liability upon its draft, but third persons, without notice of fraud, stand in a different position.

It is further contended by claimant that the guaranty fund received the benefit of the fund credited to the Papillion bank by the Union State Bank in the sum of $4,750, and that therefore it should not be heard to deny claimant's right. It is not possible from the record before us to determine the correctness of this contention. Before the guaranty fund could be said to be benefited, it would have to appear that the fund in the Union State Bank would have been available to the receiver of the Papillion bank for the payment of *depositors, exchange or other claims upon the fund.* It is argued that by the application of the fund to the bills payable of the Papillion bank, the guaranty fund was relieved *pro tanto;* but such bills payable were not claims upon the guaranty fund, and it is probable that the Union State Bank had the right to apply the fund as it did. But this question need not be further discussed in view of our holding as above indicated on the other proposition.

We conclude the bill of exchange is a proper charge against the guaranty fund, and that the district court erred in the contrary holding.

It follows that the judgment of the district court must be reversed and the proceedings remanded, with instructions to allow the claim as against the guaranty fund and order the same paid therefrom, if the assets of the bank are insufficient for that purpose.

REVERSED.