No. 23,102.

THE FOURTH NATIONAL BANK OF WICHITA, *Plaintiff*, v. WALTER E. WILSON, as Bank Commissioner (FRANKLIN H. FOSTER, Substituted), et al., *Defendants*.

No. 23,103.

THE ÆTNA TRUST & SAVINGS COMPANY, *Plaintiff*, v. WALTER E. WILSON, as Bank Commissioner (FRANKLIN H. FOSTER, Substituted), et al., *Defendants*.

SYLLABUS BY THE COURT.

1. STATE BANK GUARANTY LAW—*Deposits Guaranteed—Money or Its Equivalent Must Be Placed in or at the Command of the Bank to Be Protected.* Under the section of the bank guaranty law which provides that all deposits not otherwise secured shall be guaranteed (Gen. Stat. 1915, § 600), it is necessary, in order to create a deposit, that money or the equivalent of money shall in intention and effect be placed in or at the command of the bank, under circumstances which do not transgress specific limitations of the law.

2. SAME—*Certain Certificates of Deposit Issued in Land Deal—Land Deal not a Bank Transaction—No Guaranteed Deposits Created.* The cashier of a bank, with others, contracted to purchase a ranch in New Mexico. In part payment of the price, the cashier issued the bank's draft for $25,000, for which the bank received no consideration. The cashier then purchased the interests of his co-contractors and, in part payment of the price, gave them four certificates of deposit in his bank for $25,000 each. No deposit was made, neither the cashier nor the payees of the certificates had any funds on deposit, and the bank received no consideration for issuance of the certificates. The cashier, and an associate interested with him, planned to place title to the ranch, and title to ranches which they owned individually, in a corporation which would issue and sell bonds in the sum of $500,000, secured by trust deed. From proceeds of the sale of bonds the associate would be enabled to take up undesirable paper bearing his indorsement, to the amount of $129,000, which the bank held. The transaction considered, and *held*, it was not inaugurated and carried through for benefit of the bank, and was not a bank transaction at all.

3. SAME—*Debit Slips Placed in Cash Drawer by Cashier—No Deposit Created.* When the draft and when the certificates of deposit were issued, the cashier placed debit slips in the bank's cash drawer indicating they were to be charged to his account. *Held*, the debit slips were not bank memoranda, and were of no force as evidencing or creating a deposit.

4. SAME—*Certain Transactions Between Cashier and Bank Examiners Considered—No Ratification of Certificates—No Deposit Effected Thereby.* Immediately after the certificates of deposit had been delivered, the cashier's misconduct was discovered by state bank examiners, to whom he tendered his ten-day secured note to the bank for $125,000, which was accepted for the bank's protection. The cashier's account was credited with the amount of the note, he gave his check to the bank for the same sum, and the debit slips were destroyed. The transaction considered, and *held*, the bank did not ratify issuance of the certificates, and no deposit sustaining the certificates was completed or effected.

5. SAME—*Status of Certificates of Deposit Fixed when Issued—Cannot Subsequently Be Made Liabilities against Guaranty Fund.* Afterwards, offi-

cials of the bank and officials of the state banking department assisted the promoters in an effort to consummate the plan of issuing and selling bonds of the corporation to which the ranches were conveyed. *Held*, status of the certificates of deposit was fixed when they were issued and, conceding the bank might, by ratification, make them bank liabilities, nothing the bank might do, and nothing the banking department might do could make them liabilities of the bank depositors' guaranty fund.

6. SAME—*Effect of Negotiating Certificates to Innocent Purchasers.* Negotiation of the certificates of deposit to innocent purchasers did not confer on the purchasers privilege of participation in the guaranty fund.

Original proceedings in mandamus. Opinion filed February 11, 1922. Writs denied.

*C. H. Brooks, J. D. Houston, Willard Brooks, R. L. Holmes, C. G. Yankey, W. E. Holmes, Dudley Eaton, Fred Stanley, B. F. Hegler,* and *Vincent F. Hiebsch,* all of Wichita, for the plaintiffs.

*Richard J. Hopkins,* attorney-general, *John G. Egan,* assistant attorney-general, *J. B. Larimer, A. A. Godard, Arthur J. Myers, Robert Stone, George T. McDermott,* and *Robert L. Webb,* all of Topeka, for the defendants.

The opinion of the court was delivered by

BURCH, J.: The actions are actions of mandamus, to compel the bank commissioner to issue to the plaintiffs depositors' certificates payable from the bank depositors' guaranty fund.

When the actions were commenced Walter E. Wilson was bank commissioner, and was made defendant. At the expiration of his term of office, Franklin H. Foster, the present commissioner, was substituted as defendant. The Fourth National Bank's cause of action is based on time certificates of deposit Nos. 1243 and 1245, for $25,000 each, issued by the Kansas State Bank of Salina. Certificate No. 1243 was issued to D. H. Mollohan, and certificate No. 1245 was issued to W. C. Myers. The certificates were negotiated to the plaintiff bank in due course. The Ætna Trust & Savings Company's cause of action is based on time certificate No. 1247, for $25,000, issued by the Kansas State Bank to W. S. McClintock, and negotiated to the trust company in due course. The bank commissioner refused to recognize the certificates as liabilities of the guaranty fund. The certificates had a common origin, and the court appointed Honorable Charles L. Hunt commissioner to take the evidence and return findings of fact and conclusions of law in the two cases. His report has been filed, and he recommends that the writ be denied. The plaintiffs take exceptions to certain findings of fact and conclusions of law, and the cause is submitted on the pleadings, the evidence, the commissioner's report, and the exceptions.

The Traders' State Bank of Salina became financially embarrassed, and was reorganized under the name, The Kansas State Bank. Both institutions were dominated by Felix Broeker, who made bold attempt to establish a new altitude record in financial aviation in Kansas. In November, 1918, he yielded pilotage of the bank to H. J. Lefferdink, who became cashier. The bank carried paper bearing Broeker's indorsement to the amount of $300,000. On December 21, E. J. Guilbert was chosen president of the bank, but he did not become actively identified with it until December 29.

Broeker owned a ranch in Texas, and Lefferdink owned a ranch in Nebraska. Shore & Hill owned a well-stocked ranch at Santa Rosa, New Mexico. In November, 1918, Broeker, Lefferdink, McClintock, Mollohan, O. N. Shore and E. S. Keller undertook to purchase the Shore & Hill ranch and cattle for $400,000, and some steps were taken to complete the purchase. The plan was to organize a corporation with a capital stock of one million dollars, which was to take title to the property. Stock of the corporation was to be sold, and the proceeds were to be applied to payment of the purchase price, out of which a depositary having the papers in escrow was to pay for account of the vendors some mortgages on the land and cattle. Unsold stock was to be divided among the promoters. Broeker and Lefferdink were to have one-fifth, which was to be carried in Lefferdink's name. Late in December, 1918, Lefferdink purchased the interests of McClintock, Mollohan, Shore and Keller in the Santa Rosa ranch. The consideration to be paid was $50,000 to McClintock, $25,000 to Mollohan, $25,000 to Shore, and $25,000 to Keller. Before the deal was closed Keller sold to Myers. The new plan was for Lefferdink and Broeker to place title to their individual ranches and title to the Santa Rosa ranch in the Bankers' Land, Cattle & Development Co., a corporation to be organized, which would issue bonds to the amount of $500,000, secured by trust deed to the Wichita Trust Company.

The contract with Shore & Hill required payment of $25,000 in cash and $75,000 on or before December 10, 1918. When the papers incident to this transaction were executed, the purchasers paid $600 each. On December 10, Lefferdink caused to be issued a draft for $25,000, drawn by the Kansas State Bank on the Mid-West National Bank of Kansas City, Mo., payable to the National Stockyards Bank of that city. This draft was indorsed on its face "For Shore & Hill," and was paid to the payee on account of the

purchase of the Santa Rosa ranch. The Kansas State Bank received no consideration for this draft, but a debit slip was placed in the. cash drawer indicating the item should be charged to the account of H. J. Lefferdink. The debit slip remained in the cash drawer until December 30.

Lefferdink settled with his associates in the purchase of their interests in the Santa Rosa ranch in the following manner: Shore was given $6,000 in cash, and notes of Lefferdink and Broeker for $19,000. McClintock was given certificate No. 1247, and another certificate of the Kansas State Bank for $25,000, No. 1246. Mollohan received certificate No. 1243, and Myers received certificate No. 1245. After close of business on Saturday, December 28, certificates 1243 and 1245 were entered on the books of the bank as transactions of that day. Certificates 1246 and 1247, although delivered to McClintock on December 28, were not entered on the books of the bank until December 30. Lefferdink placed a memorandum in the cash drawer indicating that these certificates were to be charged to him. The commissioner returned the following finding of fact, to which no exception has been taken:

"11. At the time of the issuance of the four certificates of deposit above mentioned, there was no money or anything of value. deposited in the Kansas State Bank by any of the payees named in said certificates, nor by H. J. Lefferdink for them, nor did they, or any of them, or H. J. Lefferdink, have on deposit in said bank funds or other thing of value. The Kansas State Bank received no consideration for the issuance of said certificates, or any of them, at the time the same were issued, . . ."

Mollohan gave testimony to the following effect concerning sale of his interest in the Santa Rosa ranch to Lefferdink: McClintock told Mollohan of Lefferdink's plan, and advised Mollohan to see Broeker, which Mollohan did. Broeker made several propositions, which Mollohan rejected, and Broeker arranged for Mollohan to meet Lefferdink personally, with others. The plan of Lefferdink and Broeker to put their ranches with the Santa Rosa ranch and form a corporation, was discussed, and it was said that, if Broeker sold mortgage bonds to the amount of $500,000, they could pay off the liens on the ranch, and the balance of the money would be given to the Salina Bank to take up Broeker's indorsements in the sum of $129,000. Lefferdink said he had $125,000 in the bank himself. The condition of the bank was such, the bank commissioner would not allow him to pay cash, but he could give Mollohan a certificate

of deposit for $25,000, and give Keller a certificate of deposit, due in 60 days. By that time the bank would be in condition to permit him to take his money out. Lefferdink said he was doing this to enable Broeker to make some money and take up his paper in the bank.

On Sunday, December 29, Guilbert arrived in Salina, and that evening had an interview with his cashier, Lefferdink, at the bank. They went through the Broeker paper. Guilbert had known there was Broeker paper in the bank, but he was amazed to find that it amounted to $129,000. The paper was of doubtful value, and probably bad. Lefferdink revealed to Guilbert a plan whereby the Broeker paper would be taken out of the bank. Lefferdink said he was acquiring the interests of McClintock, Mollohan and others in a New Mexico ranch, and would need some short-time assistance from the bank to handle the deal. He was going to put up that property as security for the Broeker paper, and as soon as bonds were sold it would be taken up. When asked how he could afford to secure Broeker's paper, he said Broeker was interested in the ranch, and he had an assignment of Broeker's interest. Details of the scheme to transfer Lefferdink's ranch, Broeker's ranch, and the Santa Rosa ranch to a corporation, which would float bonds secured by trust deed, were unfolded. Lefferdink said the Santa Rosa ranch was worth a million dollars, and arrangements had been made for placing the bonds. In this conversation Lefferdink did not indicate how much money he might need to carry out his plans, and made no request for a loan of definite amount. He concealed the fact that he had already purchased and had assignments of the interests of his associates, and concealed the fact that the draft of December 10 and the four certificates of deposit had already been issued.

On Monday morning, December 30, Assistant Bank Commissioner Johnson and Bank Examiner Harper unexpectedly arrived at the bank, to examine it, and the cat was out of the bag. To the banking department officials Lefferdink said he was buying a ranch in New Mexico stocked with horses and cattle, and he expected to make a nice profit; he expected to make enough money to take up the Broeker paper to which the department had objected, and to take up the certificates of deposit and draft. When asked how he could afford to take up Broeker's obligations, he said Broeker had been assisting him, he had let Broeker in for part of the ranch, and

in return for taking Broeker paper out of the bank, Broeker was to assign his interest in the ranch to Lefferdink. After Johnson and Harper had received Lefferdink's explanations, they notified Guilbert, and Guilbert learned for the first time of the draft and certificates of deposit, and of Lefferdink's having taken over the Santa Rosa ranch. That evening a director's meeting was held, and the board of directors learned for the first time what had occurred.

Following the interview with Johnson and Harper, Lefferdink prepared and tendered to them his note to the bank for $125,000, with Nebraska real estate and chattel security, which, after some objections to the form of the security had been met, was accepted. The note matured in ten days. Lefferdink made no suggestion that the note was to be paid in ten days from the consolidated ranch project, but he said Broeker would sell, in the east, drafts of some of his companies, and Lefferdink expected returns from those drafts to reach Salina in time to pay the note. The note was placed among the assets of the bank, Lefferdink was given credit for the amount, he gave his check to the bank for the same amount, and the debit slips were taken from the cash drawer and destroyed.

After December 30, the bank officials, the bank commissioner and Broeker coöperated in an effort to carry out the plan to issue and sell bonds of the Bankers' Land, Cattle & Development Co. The bank commissioner kept firm grasp of the enterprise, for protection of the bank. He was assisted by Mr. John L. Hunt, assistant attorney-general, who was detailed to advise the bank commissioner concerning affairs of the Kansas State Bank. The bank commissioner's approval of the plan and his participation in it resulted from his belief that the bonds were marketable and, if they were marketed, the bank would be relieved of Broeker and Lefferdink paper. The commissioner of this court finds that the three ranches, including lease rights, improvements, and live stock, were worth in the aggregate $589,000. Felix Broeker possessed and had demonstrated remarkable ability to sell securities to investors. The probabilities are he reduced the amount of his paper in the bank from $300,000 to $129,000 by employment of his talent for obtaining money. He went to New York to dispose of the bonds, and Guilbert went with him to assist him. There was fair prospect they would succeed, when Broeker's arrest on a criminal charge put an end to the entire project. In May, 1919, a receiver for the bank was appointed. Lefferdink's note was not paid. All avail-

25—110 KAN.

able security was exhausted and, on account of circumstances which need not be recited, the receiver was able to realize but little with which to offset Lefferdink's raid on the Kansas State Bank.

The foregoing constitutes a bare outline of the pertinent evidence and findings, which are voluminous. The plaintiffs contend the transactions which embraced the certificates of deposit and Lefferdink's note and mortgages, were bank transactions, inaugurated and carried through primarily for benefit of the bank. They undertake to support the contention by the findings, modified and supplemented in accordance with exceptions. There are no findings and there is no evidence from which the proposed inferences may be legitimately derived.

Broeker had wrecked the Traders' State Bank, by making it dumping ground for his paper, and had been put out. Within a month after Lefferdink became interested in the bank he appeared in intimate association with Broeker, and commenced to use the bank to promote private speculations of Broeker and himself. Purchase of the Santa Rosa ranch was initiated by misappropriation of $25,000 of the bank's funds to pay Shore & Hill. Mollohan testified Lefferdink visited the Santa Rosa ranch while negotiations with Shore & Hill were pending. Inspection of the ranch revealed possibilities. The ranch was exceptionally attractive and very valuable. The profits to be derived from combining it with Broeker's ranch and Lefferdink's ranch in a financial scheme which Broeker was capable of handling, were very alluring, and Lefferdink and Broeker set about procuring the ranch for themselves. Lefferdink said Broeker was interested in the ranch. The extent of his interest is not disclosed. His Texas ranch, which was to be conveyed to the Bankers' Land, Cattle & Development Co., to form the basis of a bond issue, was worth $95,000, and was subject to an encumbrance of only $22,000. Lefferdink's Nebraska ranch was worth only $84,000, and was subject to an encumbrance of $30,000. Therefore, Broeker was substantially interested. The object was to make money. Lefferdink said he was buying out his associates so Broeker could make money, and he said he expected to make a nice profit for himself. One object of making money is to obtain wherewithal to discharge obligations, and Lefferdink said Broeker would be enabled to take up his paper in the Kansas State Bank. That paper had occasioned Broeker's downfall as a banker, and it continued to dog his footsteps. Besides that, it was necessary for Lefferdink to use his bank

to finance the purchase. He had no money. His debit slip for the $25,000 draft of December 10 still lay in the cash drawer. He was obliged to invent the story of $125,000 to his credit in the bank which the bank commissioner would not permit him to withdraw, in order to explain to Mollohan and others use of certificates of deposit. When Johnson and Harper interfered, he was obliged to give his note before he could write his check. The bank commissioner could block any move which did not include liquidation of the Broeker paper, and to satisfy him it was very necessary to say that proceeds from the sale of bonds would be devoted to retirement of that paper. Guilbert and the board of bank directors might become restless at Lefferdink's free and peculiar use of bank funds, and in that event they might be quieted by administering to them retirement-of-Broeker-paper bromide.

If the Kansas State Bank, suffering from possession of Broeker paper, voluntarily stepped into a Lefferdink-Broeker speculation, and advanced $125,000 for the purpose of aiding future collection of $129,000, some officer clothed with authority should have exercised the corporate will to that end, and somebody should have known about it. The bank commissioner testified that, so far as he knew, the bank had nothing to do with the Lefferdink-Broeker plan. The board of directors knew nothing about it, the president of the bank knew nothing about it, and Lefferdink claimed the Santa Rosa ranch affair was his own. When Guilbert was apprised of it, Lefferdink said he would need financial assistance from the bank to carry it out. He was going to put up the Santa Rosa ranch to secure the Broeker paper. The next day he told Johnson and Harper he was buying the ranch; it would net him a nice profit; he was going to make enough money to take Broeker's paper out of the bank; he could do that because he had an assignment of Broeker's interest. Johnson and Harper, however, had caught him with his hand in the till, and he immediately proposed to protect the bank by giving his own note and mortgage as security. In ten days' time the money would be forthcoming to pay his note. Nothing was said about the bank abiding realization on its own venture, and it is interesting to note that Felix Broeker was to sally forth, with his pockets full of drafts, as rescuer.

It is not necessary to pursue the subject further. It did not occur to any of the participants that the transactions involving issuance of the certificates were bank transactions, and the court regards the

notion as quite fanciful. Instead of the bank being actor, it was a mere instrument prostituted to Lefferdink's and Broeker's use; instead of retirement of Broeker paper being primary object, it was a mere incident; and the court finds the transactions referred to by the plaintiffs were not inaugurated and carried through primarily for benefit of the bank, and were not bank transactions at all.

Commissioner Hunt made the following finding:

"23. Lefferdink did not execute or place in the bank any note, mortgage or other security until he was confronted by Johnson and Harper on December 30. His note and mortgages were afterwards tendered and retained by the bank by the direction of Johnson and Harper, not as a loan to him or as a ratification of his acts in drawing the $25,000 draft or in issuing the four certificates of deposit, but to secure the bank, if possible, against the loss occasioned by his wrongful appropriation of the bank's funds to the extent of $125,000 to purchase property for himself."

The plaintiffs contend this finding is really a conclusion of law; but if treated as stating ultimate inferences of fact, it is contrary to findings of specific facts, modified and supplemented according to exceptions.

It is not material that the ranch scheme was financially sound, and would have retired the Broeker paper and recompensed the bank for the draft and certificates of deposit, had the promoters been allowed to consummate it. Lefferdink had no authority to issue bank obligations to discharge his personal obligations contracted in the purchase of property for himself. When his conduct was exposed by Johnson and Harper, the suggestion of financial assistance made to Guilbert the night before was not renewed, and the bank made no loan to Lefferdink. The money paid to meet the draft was gone. Whether the certificates of deposit were legal liabilities of the bank or not, they had gone from the bank, were in circulation, and had no deposit of money or money equivalent behind them; and Lefferdink's note and mortgages were given and accepted to protect the bank, as far as possible, against consequences of his malfeasance. If a loan which bore relation to the certificates had been intended, the maturity of Lefferdink's note would have coincided with maturity of the certificates. If ratification of the certificates had been intended, all that was necessary was to proceed with the sale of bonds. Instead of that, the Shore & Hill draft and the certificates were treated alike as wrongful means of abstracting bank funds, and Lefferdink's note was a ten-day note, to be taken up in ten days

with cash.　On account of required changes in form, Lefferdink's mortgages had not been executed when the directors' meeting was held on the evening of December 30.　Concerning this meeting, Commissioner Hunt makes the following finding, to which no exception is taken:

"18.　No decisive action was taken at this meeting, and no record was made of the proceedings.　Mr. Guilbert considered more seriously the question of how to get back the money that was gone, or some security for it than the extension of credit to the amount of $125,000 to Mr. Lefferdink.　The matter was left to be handled by the banking department to make the best of the situation."

The result is, finding 23 is a finding of fact, and the court approves it.

It is of no consequence that after December 30 bank officials and the banking department assisted in carrying out the plan to obtain money by sale of corporate bonds secured by trust deed.　The status of the certificates of deposit was fixed at the time they were issued. Conceding the bank might so ratify them as to make them bank liabilities, nothing the bank might do, and nothing the banking department might do, could make them liabilities of the guaranty fund. The guaranty fund was established for the protection of deposits, and no deposit was made.

The statute reads as follows:

"All deposits not otherwise secured shall be guaranteed by this act.　The guaranty as provided for in this act shall not apply to a bank's obligation as endorser upon bills rediscounted, nor to bills payable, nor to money borrowed from its correspondents or others."　(Gen. Stat. 1915, § 600.)

Whether or not a deposit has been made depends on the nature of the transaction.　As Commissioner Hunt states in one of his conclusions of law—

"The bank guaranty law guarantees certain deposits, but not evidences thereof, whether they take the form of certificates, promissory notes, or receipts."

There is no all-inclusive and all-exclusive definition of the term "deposit," but the essentials are well understood.　Money left with a bank, subject to order of the person leaving it, is a deposit.　A deposit may be accomplished by taking credit on the books of the bank for a discounted note, or even by some obligatory arrangement with the bank for credit.　In creating a deposit, pure formalities may be dispensed with, such as taking money across the counter on

a matured certificate of deposit, and passing it back to obtain a new certificate. The court has just decided that a deposit may be effected by giving a bank credit in another bank, subject to check or draft. (*Bank v. Foster,* post, p. —.) In the case just cited, the distinction between a deposit and a loan is discussed. When the primary purpose is not to establish the relation of debtor and creditor between bank and depositor, but to discharge some matured obligation of the bank by giving a time certificate of deposit, the certificate is no more than a bill payable. Speaking generally, to create a deposit, within the meaning of the statute, money or the equivalent of money must in intention and effect be placed in or at the command of the bank, under circumstances which do not transgress specific limitations of the bank guaranty law; and in the present instance nothing approaching a deposit was made.

The plaintiffs contend the pieces of paper which Lefferdink placed in the cash drawer, indicating the draft and certificates should be charged to his account, created a credit against which the certificates were issued. Lefferdink was stripped of all authority as cashier, because he was attempting to use his bank for personal ends, and the debit slips had no more force than they would have had if Shore & Hill and Mollohan and McClintock and Myers had placed them in the cash drawer. The court might be charged with making vain show of profundity if it should append a list of authorities to these statements. The slips might enable the bookkeeper to show balance of his books by counting them as cash, but they were not bank memoranda. The only obligation in existence to which the slips might be referred was the implied obligation of Lefferdink to make good his misappropriation of bank money and credit. That obligation did not constitute a deposit. Besides that, the debit slips were not in fact used. No entry was made on the books of the bank pursuant to them. The record was made up from Lefferdink's note and check for $125,000 and, as indicated in the discussion of finding 23, the giving and acceptance of that note was no part of any transaction embracing a deposit on which to found a certificate of deposit.

Lefferdink issued the certificates to pay for the Santa Rosa ranch because he did not have the money with which to pay for it. He had no intention to use certificates based on a deposit, or to make any deposit which should relate to their issue. The certificates were time certificates, and would be met when due, not from any deposit

made, or from assets including a deposit made, but from money subsequently to be obtained as pleased Providence. Employment of debit slips to give appearance of regularity on the bank records had no effect, and was not intended to have effect, on the essence of what had been done. The certificates were still precisely what they were when delivered to the payees—bank obligations issued by the cashier without consideration to the bank, to pay for property the cashier was buying for himself. When talking with Guilbert on Sunday, there came to Lefferdink's mind a course which he might have pursued, but did not, which would have made the certificates legitimate —an authorized loan by the bank, and acceptance of authorized certificates of deposit with which to pay his vendors. When Johnson and Harper called Lefferdink to account, the nature of the depredation on the bank was interesting, but not important. The desideratum was protection of the bank, not creation or completion of a deposit, and until the Kansas State Bank accepted a deposit by or for the payees of the certificates, there could be no deposit.

The plaintiffs insist the court should hold the certificates to be guaranteed because they are negotiable instruments, and were acquired by the present holders in due course; otherwise, it is said, certificates of deposit will be deprived of the quality of commercial paper; certificates of deposit have been regarded as the highest form of collateral; they are of wide currency in the banking and business worlds, and are particularly useful to persons of small means, because they bear interest, and may be readily cashed; therefore, to deprive them of the benefit of the guaranty fund would be a calamity. The argument confuses negotiability of commercial paper with statutory guaranty of deposits. The guaranty is something extrinsic to all forms of evidence of bank obligation; and negotiability of instruments has no dependence on existence or nonexistence of the guaranty.

The transaction out of which the certificates arose was not the first one of its kind in the history of banking previous to enactment of the guaranty law. It may be assumed the legislature was familiar with common forms of malfeasance of bank officers, and familiar with commercial and other uses of negotiable paper, including certificates of deposit. The negotiable instruments act was passed in 1905, and the bank guaranty act in 1909. Extent of the guaranty to be provided was a matter of legislative choice, and the legislature

stopped with unsecured deposits. Deposits made in fact and in good faith are to be protected against the consequences of economic avalanche, financial panic, misfortune, poor banking methods, and dishonesty of bank managers; but the legislature did not attempt to underwrite banking as practiced by the Lefferdinks in the business, or to underwrite bank paper generally, and the court is powerless to enlarge the statute. In this instance, the payees of the certificates made no deposit, and the cashier did not make or undertake to make deposit for them. He said the bank commissioner would not allow him to use his own money. The payees knew the cashier was issuing the certificates in payment of his private debt, and were bound to know the Kansas State Bank was not certifying to anything. Therefore, when the certificates were put in circulation, there was nothing to which the guaranty might attach. Whatever the status of the plaintiffs may be as holders in due course under the negotiable instruments law, they cannot be assignees of a deposit which was not made, and cannot be entitled to benefit of a guaranty which did not come into existence. (*Bank v. Foster,* supra.) If this operation of the bank guaranty law works public detriment instead of public benefit, the granting of relief lies with the legislature.

The plaintiffs claim benefit of the guaranty fund because the recitals in the instruments are conclusive that deposits were made; because of participation of the bank commissioner in issuance of the certificates; and because of matters of equitable consideration resembling those on which subrogation is allowed. Similar claims are discussed and disposed of adversely to the plaintiffs in the case of *Bank v. Foster,* already referred to. Other subjects presented in the briefs do not require special mention.

The writ is denied in each case.