No. 24,556.

W. T. BLOOMHEART, *Plaintiff*, v. F. H. FOSTER, Bank Commissioner (C. J. PETERSON, Substituted), *Defendant*.

SYLLABUS BY THE COURT.

1. BANKS AND BANKING—*General Deposits Create Relation of Debtor and Creditor—Special Deposits Create the Relation of Bailor and Bailee.* Where a deposit is made generally with a bank, the relation between the bank and depositor is that of debtor and creditor. But, where a deposit is made specially, for safe-keeping, the relation between the depositor and the bank is that of bailor and bailee.

2. SAME—*Mandamus—Evidence Shows Plaintiff's Deposit Was a Special Deposit and Created the Relation of Bailor and Bailee and is Not Protected by the Depositor's Guaranty Fund.* Where a depositor left $2,700 of United States bonds with a bank for safe-keeping, the bonds being placed in an envelope with other papers belonging to the depositor, the envelope being marked with his name and address, and where the depositor called at the bank and clipped the interest coupons and where the bank, without the depositor's knowledge, took the bonds from the depositor's envelope and sold them, and some four months later the bank, without advising the depositor that the bonds had been disposed of, executed an agreement with the depositor in which it was specified that the depositor loans the bonds to the bank to be used and accounted for by the bank, the bank agreeing to deliver to the depositor bonds of the same description and issue except as to serial number, held, (a) the various acts of the parties are to be construed together in ascertaining their intention, (b) that the depositing of the bonds with the bank in the first instance created the relation of bailor

and bailee, (c) that, at the time of the execution of the last contract, the depositor was no longer the owner of the bonds and the act of the parties did not create a deposit, in the contemplation of the depositors' guaranty fund law.

Original proceeding in mandamus. Opinion filed December 8, 1923. Writ denied.

*J. E. Torrance,* and *O. W. Torrance,* both of Winfield, for the plaintiff.

*Charles B. Griffith,* attorney-general, *John G. Egan,* assistant attorney-general, *J. B. Larimer* and *Clad Hamilton,* both of Topeka, for the defendant.

The opinion of the court was delivered by

HOPKINS, J.: The action is one of mandamus to compel the bank commissioner to issue to plaintiff a certificate payable out of the bank depositors' guaranty fund.

The Traders State Bank of Arkansas City closed its doors March 15, 1922. For eight or ten years previous to that time the plaintiff had carried with it a checking account. On January 11, 1921, the plaintiff left with the bank $2,200 of Victory bonds under a contract which reads:

"THE TRADERS STATE BANK.

Not Transferable                                            No.  (Copy)

ARKANSAS CITY, KANSAS, Jan. 11, 1921.

This certifies that W. T. Bloomheart has deposited with this bank United States bonds of the Victory issue of the par value of two thousand and two hundred dollars, with unmatured coupons attached, for which we agree to pay a like amount in the bonds of the same issue or cash at our option on the surrender of this certificate. Interest at the rate that these bonds bear will be credited to the savings account of the payee herein named, in place of said coupons as they mature.

Deposits in this bank guaranteed under the Guaranty law of the State of Kansas.                                    FRANK E. HENSY, *for Cashier.*"

On the same day the plaintiff also left with the bank $500 in Fourth Liberty Loan bonds under a similar contract.

On August 23, 1921, the bank sold plaintiff's bonds, together with others, totaling approximately $11,000 to the Commerce Trust Company of Kansas City, Mo.

On January 3, 1922, the plaintiff, having no knowledge that the bank had disposed of his bonds, made another contract with the bank which reads:

"MEMO CONTRACT                    January 3, 1922.

"This contract made and entered into by and between W. T. Bloomheart of Arkansas City, Kansas, party of the first part, and the Traders State Bank, Inc. of Arkansas City, Kansas, party of the second part, witnesseth: That

W. T. Bloomheart, party of the first party hereby loans to the Traders State Bank, party of the second part, the following Liberty bonds:

$2,200.00 Victory bonds.

 500.00 Fourth Liberty Loan bonds.

It is understood by and between the parties hereto that the said bonds are to be used and accounted for by the party of the second part, the same as a cash deposit, and that said bank, the party of the second part, agrees to deliver to the party of the first part, the bonds of description and issue, except as to the serial number, to the party of the first part, on demand.

W. T. Bloomheart, First Party.

The Traders State Bank, By Walter W. Olson, Ass't Cashier, Second Party."

(The following was later endorsed thereon.)

"Feby. 14, 1922. Received of the Traders State Bank $150.00 in Victory bonds.             W. T. BLOOMHEART."

Did the plaintiff, under the transactions detailed, make a deposit with the bank which entitles him to a certificate on the bank depositors' guaranty fund?

It is the contention of the plaintiff that the acts of the parties on January 3, 1922, evidenced by the agreement of that date, constituted a deposit by the plaintiff which entitles him to participate in the fund, and that all transactions relative to the bonds in question which occurred previous to that date are historical only and have no material bearing on the controversy.

The defendant contends that the transactions of January 11, 1921, did not constitute deposits but were contracts of bailment; that a bailment of bonds is not a deposit within the meaning of the bank guaranty fund act; that if the transactions constituted a deposit the plaintiff is barred because of the agreement of the bank to pay 4¼ and 4¾ per cent interest, which is in excess of that allowed on guaranteed deposits; that there was no deposit by plaintiff on January 3, 1922, because the bank had, on August 23 preceding, converted and embezzled the plaintiff's bonds; that the bonds were negotiable instruments and by the sale of August 23 the Commerce Trust Company became a purchaser, in good faith, had acquired good title, and that plaintiff's title was extinguished; that the transaction of January 23, 1922, was, therefore, not based upon any actual bonds.

Contracts of deposit, like contracts generally, are to be construed in the light of the surrounding circumstances, including the relationship of the parties. The contract should be construed as a whole, and the intention of the parties governs. (18 C. J. 566.) The plaintiff's contention that all acts of the parties preceding the con-

tract of January 3, 1922, are historical only and do not affect his case is not tenable. The plaintiff cannot escape the results of his own action. All of the acts and circumstances are to be construed together. Each step in the transaction dovetails into and modifies every other step. One who has adopted a certain line of action in a given matter may not segregate a portion which he considers to his advantage and disregard others less advantageous.

Deposits may ordinarily be classified as general and special.

In Newmark on Bank Deposits, section 11, it is said:

"Deposits made with banks may be divided into two classes, those in which the bank becomes bailee of the depositor, the title in the thing deposited remaining with the depositor, and that kind peculiar to banking business, in which the depositor, for his own convenience, parts with the title to his money, and loans it to the banker, and the latter, in consideration of the loan of the money, and the right to use it for his own profit, agrees to refund the same amount, or any part thereof, on demand. . . . A special deposit of money in a bank is made where moneys, such as bills in packages or specie in boxes, are entrusted to the bank, not to be used, but to be kept safely, and specifically returned. An ordinary bank deposit is made when a voluntary credit is taken with the bank, and for which no bank note, bill or similar evidence of debt is given and for which there exists a right to draw unconditionally."

In *Boyden v. the President and Directors of the Bank of Cape Fear*, 65 N. C. 13, it was said:

"The ordinary relation subsisting at common law between a bank and its customers on a general deposit account is simply that of debtor and creditor. A deposit by a customer, in the absence of any special agreement to the contrary, creates a debt, and the payment by the bank of the customers' checks, discharges such debt *pro tanto*. The bank or the customer may at any time discontinue their dealings, and the balance of the account between them can be easily ascertained by a simple calculation. . . . The fact that a regular customer sometimes made special deposits of bank bills with a bank, has no tendency to show that he had notice of change in the ordinary usage and custom of the bank as to general deposits, for a special deposit constitutes a contract essentially different from that which arises by implication of law from a general deposit. A special deposit is a naked bailment, and on demand of the bailor, restitution must be made of the thing deposited. And as the bank acquires no property in the thing deposited, and derives no benefit therefrom, it is bound only to keep the deposit with the same care that it keeps its own property of a like description." (Syl.)

In *National Bank v. Graham*, 100 U. S. 699, it was said:

"Sec. 5228 of the Revised Statutes, which provides that it shall be lawful for a national bank after its failure to 'deliver special deposits,' is as effectual a recognition of its power to receive them as an express declaration to that effect would have been. The phrase 'special deposits,' so employed, embraces the public securities of the United States."

The case of *Pattison v. Syracuse National Bank*, 80 N. Y. 82, was an action brought to recover the value of certain negotiable railroad bonds alleged to have been deposited for safe-keeping by plaintiff with the defendant and which the defendant refused to deliver on demand. In the opinion it was said:

"The numerous cases in the books relating to special deposits in banks, disclose how extensively, even in modern times, this business has been and is carried on,, and the general understanding in respect to it. The very act of Congress under which the national banks are organized recognizes the practice, and provides for the return of special deposits by national banks, even when required to suspend their general business. Section 46 of the act of 1864 provides that, in certain events, the banks shall cease to prosecute business, 'except to receive and safely keep money belonging to them, *and to deliver special deposits.'* This provision assumes that such banks will receive special deposits, and impliedly recognizes and sanctions their so doing, by making express provision enabling them to return them at a time when they are prohibited from paying out to depositors funds held on general deposit. . . . The term special deposits has, and has always had, a well known and defined meaning. In the *Marine Bank v. The Fulton Bank* (2 Wall., 252, 256), Miller, J., says: 'all deposits made with bankers may be divided into two classes, namely, those in which the bank becomes bailee of the depositor the title to the thing deposited remaining with the latter; and that other kind of deposit of money, peculiar to banking business, in which the depositor for his own convenience parts with the title to his money, and loans it to the banker.' This description marks the distinction between general and special deposits. In Story on Bailments (§ 88), the same distinction is recognized, and also in *Rawson v. Real Estate Bank* (5 Ark., 297). In the Vermont case itself, at page 554, the court defines general deposits; and says that at the time of the passage of the act, deposits in banks had a well known and understood meaning, and that the delivery of money, securities, or other property, to be specifically kept and re-delivered, had been equally well known as special deposits. And in *Turner v. First Nat. Bank of Keokuk* (26 Iowa, 562) the authority to return special deposits, contained in section forty six, is held to refer to deposits for safe-keeping." (p. 95.)

*Smith v. First National Bank in Westfield*, 99 Mass. 605, was a case of a special deposit of bonds with a national bank and the bank was held to be the bailee of the bonds.

In *Foster et al., Executors, v. Essex Bank*, 17 Mass. 479, a special deposit for safe-keeping was made with the defendant of a cask containing gold coin. The question was as to the liability of the bank as bailee. The court held that the practice of the bank having been to receive such deposits and its building and vaults having been allowed to be used for that purpose and its officers employed in receiving into custody the things deposited, the corporation must be deemed the depositary.

In *Nat. B'k. of Ft. Edw. v. Wash. Co. Nat. B'k*, 12 N. Y. Sup. Ct. 605, 607, it was said:

"In the strict meaning of the word, borrowed from the civil law, deposit is the delivery of a thing for custody, to be redelivered on demand, without compensation. Such are deposits of securities or valuables, in a bank, for safe-keeping. But ordinary money deposits in banks are clearly different, in this respect; the identical money deposited is not to be returned—only its equivalent; and the money deposited becomes the money of the bank. The bank really becomes debtor to the depositor."

Michie on Banks and Banking, 1297, states:

"The title to the thing deposited specially is not in the bank but remains in the depositor. Where a deposit is made generally the relation between the bank and depositor is that of debtor and creditor, but where the deposit is made specially, the relation between the bank and the depositor is that of bailor and bailee." (See, also, *Preston v. Prather*, 137 U. S. 604, 34 L. ed. 788.)

In *Scott v. National Bank of Chester Valley*, 72 Pa. St. 471, a special deposit of bonds for safe-keeping had been made with the defendant by one of its customers.

In *Lancaster County National Bank v. Smith*, 62 Pa. St. 47, a special deposit of United States bonds had been made with the bank.

In the early case of *Johnson v. Reynolds*, 3 Kan. 257, the question of a special deposit was discussed. A regular boarder at a hotel deposited gold with the hotel keeper. It was held that the bailment was a naked deposit without reward. In the opinion it was said:

"Manifestly it is that species of bailment known in law as a deposit, *depositum,* which is defined to be 'a naked bailment of goods, to be kept for the bailor without reward, and to be returned when he shall require it. (Story on Bail., §§ 4, 41.) Or a contract by which one of the contracting parties gives a thing to another to keep who is to do so gratuitously, and obliges himself to return it when he shall be requested. Pothier Traite Depot, n. 1; Civil Code of France, art. 1915." (p. 261.)

*Hale v. Rawallie*, 8 Kan. 136, considered the question of a special deposit of money. It was held that "The transaction between the parties amounted to a bailment; one of that species known as a deposit, which is defined to be 'a naked bailment of goods to be kept for the bailor without reward and to be returned when he shall require it.' "

It is clear that the relation between a bank and its depositor ordinarily is that of debtor and creditor. But, where a special deposit is made of specific articles, the relation is that of bailor and bailee. (*Bank v. Bank*, 106 Kan. 303.)

What are the facts here?

The plaintiff in his petition sets out a copy of the contract of January 11, 1921, and follows it with this allegation:

"That said Frank E. Hensy was duly authorized to issue said certificates and said bonds were then and there delivered to said bank for safe keeping and receipts were given to this plaintiff in substantially the same form aforesaid and for the purpose aforesaid; that said bank continued to hold said bonds, in so far as plaintiff knew, and this plaintiff held said receipts until about the third day of January, 1922."

The plaintiff, among other things, testified:

"That he left in the bank for safe-keeping $2,200 of Victory bonds and $500 of Liberty bonds on January 11, 1921—Fourth Liberty bonds. One bore 4¼ and the other 4¾ per cent. I received pink slip for $2,200 Victory bonds and one of similar form for the Liberty bonds. Both same date. At that time I was carrying a checking account and had for the last eight or ten years. Had a pass-book in which entries and withdrawals were made. Just deposits.

"Q. Why did you take this receipt [referring to contract of January 3, 1922] instead of having credit entered on your pass-book for the amount? A. That was what the president gave me. That is all I know. He said that would give me credit and I could check on it. I knew I could deposit money and have credit put on my book and I knew I could sell these bonds and put the proceeds in the bank.

"Q. Did you sell the bonds at that time? A. That is all the conversation that took place and what the bank gave me. The receipt represents what took place and represents the arrangement made with the bank. I knew I could have sold the bonds and taken credit. So far as I can see one is as good as the other. Walter Olson, assistant cashier signed the contract. I read it over.

"Q. You stated here that 'W. T. Bloomheart hereby loans to the Traders State Bank the following.' You read that statement in the receipt before signing it? A. Yes, sir.

"Q. You knew you were signing the statement at that time? A. Yes, sir."

E. H. Armstrong, assistant receiver of the bank, testified to the selling of $11,000 of Liberty bonds to the Commerce Trust Company in August, 1921; that plaintiff's bonds were included; also that there appeared on the brown envelope in which the Bloomheart bonds were kept, "Property of W. T. Bloomheart, 306 South C. St. Arkansas City, Kansas. Liberty bonds purchased through Traders State Bank, Arkansas City, Kansas;" that there were various other papers in the envelope, including a receipt given by the bank signed by F. E. Hensy in which he received from W. T. Bloomheart, June 8, 1921, the papers for safe-keeping.

Frank E. Hensy testified, among other things, that Bloomheart had some bonds in the bank; that he looked after the bonds and notes; that when Liberty and Victory bonds were left for safe-keeping he gave receipts; that he remembered Bloomheart getting the bond interest; that he did not remember when Bloomheart first left his bonds in the bank; that his bonds were kept in the brown envelope; that he had a couple of other notes and some kind of certificates from the Masons in the envelope—certificate of stock—and his daughter had some bonds in there.

There was in evidence, a statement by Frank E. Hensy made to the receiver of the bank which, among other things, contained this language:

"The first part of January 1921, at the time so many deposit boxes of banks around the country were being rifled, Mr. W. T. Bloomheart became leary of keeping his Liberty bonds in the safety deposit box in the Traders State Bank, and at that time I informed him that a great number of people left their bonds for safe-keeping with the bank, and these were deposited in the bank safe. Mr. Bloomheart decided to do this, and on or about January 11, 1921, gave me his bonds to be kept for him. These were placed in an envelope, and on the outside of the enevelope was Mr. Bloomheart's name."

What happened in this case is perfectly apparent. The plaintiff had been for a number of years a customer of the Traders State Bank. He carried a regular checking account, having a passbook in which general deposits were noted, against which he checked. In January, 1921, having some Liberty bonds, he decided to leave them with the bank for safe-keeping. They were placed in a brown envelope marked "Property of W. T. Bloomheart" and left with the bank. The brown envelope contained various other papers and receipts belonging to the plaintiff. All were left with the bank for safe-keeping. In August, 1921, the bank took the plaintiff's bonds, without his knowledge, and sold them to the Commerce Trust Company, the bank, expecting later to replace the bonds. The bank finally failed without having replaced plaintiff's bonds. In the meantime, however, the officers of the bank, realizing the situation, and hoping to protect the plaintiff against possible contingencies, executed the contract of January 3, 1922, under the belief that the plaintiff would be protected by the depositors' guaranty fund.

It is clear that it was never contemplated by the legislature that the depositors' guaranty fund should protect special deposits in the nature of bailments. Reference to the various sections of the statute touching deposits leads to but one conclusion: that the

guaranty fund is for the protection of general deposits, made with the bank, of money or its equivalent, when title passes to the bank and there is created between the depositor and depositary the relation of creditor and debtor.

The Kansas statute authorizing the organization of banking corporations states that they "shall be permitted to carry on the business of receiving money on deposit and to allow interest thereon, giving to the person depositing credit therefor." (Laws of 1921, ch. 72, § 3.) It is apparent that the legislature, in enacting this statute, had in mind general deposits.

In *National Bank v. Bank Commissioner*, 110 Kan. 380, 389, this court, in considering a claim against the guaranty fund, said:

"Whether or not a deposit has been made depends on the nature of the transaction. As Commissioner Hunt states in one of his conclusions of law— 'The bank guaranty law guarantees certain deposits, but not evidences thereof, whether they take the form of certificates, promissory notes, or receipts.' There is no all-inclusive and all-exclusive definition of the term 'deposit,' but the essentials are well understood. Money left with a bank, subject to order of the person leaving it, is a deposit. A deposit may be accomplished by taking credit on the books of the bank for a discounted note, or even by some obligatory arrangement with the bank for credit. In creating a deposit, pure formalities may be dispensed with, such as taking money across the counter on a matured certificate of deposit, and passing it back to obtain a new certificate . . . . Speaking generally, to create a deposit, within the meaning of the statute, money or the equivalent of money must in intention and effect be placed in or at the command of the bank, under circumstances which do not transgress specific limitations of the bank guaranty law," etc.

The plaintiff contends that the transaction of January 3, 1922, was a sale of his bonds to the bank and a resulting deposit at that time.

The fundamental distinction between a sale and a bailment lies in whether an obligation exists to restore the thing delivered in the same or in an altered form, and whether the title passes. The transaction is a bailment if the identical thing is to be returned, although in altered form. (6 C. J. 1086.)

It is essential to a deposit, whether general or special, that there shall be, at the time of the transaction, money or its equivalent or specific property actually delivered by the depositor to the depositary. There are various statutes indicating that "a deposit" means something received by the bank at the time. (See Gen. Stat. 1915, §§ 532, 533, 555, 567, 584, 585, 586.)

Bloomheart v. Bank Commissioner.

Under the circumstances narrated in this case, the plaintiff deposited his bonds with the bank for safe-keeping. This was no sale. On January 3, 1922, the plaintiff had no bonds to sell. At that time there existed an obligation from the bank to the plaintiff which was due. Its contract of that date was for the purpose of evidencing that obligation.

In *National Bank v. Bank Commissioner*, supra, it was said:

"When the primary purpose is not to establish the relation of debtor and creditor between bank and depositor, but to discharge some matured obligation of the bank by giving a time certificate of deposit, the certificate is no more than a bill payable." (p. 390.)

In *Lankford, State Bank Commissioner, v. Schroeder*, 47 Okla. 280, it was said:

"Where one who purchases notes from a state bank, paying cash therefor, leaves the notes in the bank under an agreement with the cashier that the bank will collect the notes and place the money received to the purchaser's credit account in the bank, and the bank afterwards collects the notes and, without the purchaser's knowledge or consent, appropriates the money to its own use without giving the purchaser credit therefor, and the bank afterwards, without paying the purchaser his money, except a very small part thereof, fails and goes into the control of the State Bank Commissioner under the state banking law, *held,* the purchaser of the notes is not a depositor of the failed and insolvent bank, and is not entitled to payment of his claim against the bank out of the bank's assets in the hands of the bank commissioner and necessary for the payment of the bank's depositors, or out of the state guaranty fund."

It is apparent that if it had been the intention of the plaintiff to sell his bonds to the bank and receive credit therefor, and the intention of the bank to buy his bonds and give him credit therefor, he would have been given credit in his pass-book in a similar manner to that in which he had been doing business with the bank over a period of years. All the circumstances show clearly that such was not the intention of the parties. Other questions presented in the briefs need not be discussed.

Writ denied.