No. 26,591.

THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF LABETTE, Suing for Itself and All Other Depositors of the Oswego State Bank, of Oswego, Similarly Situated and Aggrieved, *Plaintiff*, v. ROY L. BONE, as Bank Commissioner of the State of Kansas, *Defendant*.

SYLLABUS BY THE COURT.

1. BANKS AND BANKING—*Depositors' Guaranty Fund—Right to Participation.* The right of depositors in an insolvent bank to certificates drawn on the bank depositors' guaranty fund depends upon whether the bank was a certified participant in the voluntary bank guaranty system and had complied with the provisions of the bank depositors' guaranty act; and the right of such depositors is not dependent upon the collateral question whether the bank had been conducted in full compliance with all the provisions of the general banking law.

2. SAME—*Depositors' Guaranty Fund—Acts Sufficient to Terminate Participation.* The steps taken by the bank commissioner to exclude a participating bank from the benefits of the guaranty system considered, and *held*, that the provisions of the statute pertaining to such exclusion were not complied with, and the bank commissioner's order terminating the bank's relation to the guaranty system was ineffective against plaintiff's right to a certificate on the bank depositors' guaranty fund.

3. SAME—*Depositors' Guaranty Fund—Effect of Violation of General Banking Law.* The fact that a bank which holds a certificate as a participant in the bank guaranty system and which has complied with all the provisions of the bank depositors' guaranty act was a persistent and long-continued vio-

---

Banks and Banking, 7 C. J. pp. 484 n. 75, 485 n. 82.    Constitutional Law, 12 C. J. pp. 887 n. 38, 891 n. 73.    Officers, 29 Cyc. p. 1364 n. 28.

lator of the general banking law does not deprive its depositors of the protection of the bank depositors' guaranty fund.

*Original proceeding in mandamus.* Opinion filed April 10, 1926. Writ allowed.

*Payne H. Ratner,* county attorney, *Charles H. Cory,* assistant county attorney, and *Elmer C. Clark,* of Oswego, for the plaintiff.

*Robert Stone, George T. McDermott, Robert L. Webb,* and *Beryl R. Johnson,* all of Topeka, for the defendant.

The opinion of the court was delivered by

DAWSON, J.: The board of county commissioners of Labette county invoke our original jurisdiction in mandamus to require the bank commissioner to issue a certificate against the bank guaranty fund for $18,230.73 to reimburse Labette county for county deposits lost or indefinitely tied up through the insolvency of the Oswego State Bank. The county's demand is resisted on the theory that the county's money was not protected by the guaranty fund. This defense is based upon the following facts:

For some time prior to the enactment of the statute providing for the security of depositors in the incorporated banks of Kansas (Laws 1909, ch. 61) the Oswego State Bank had been a banking corporation doing business under authority of law.

On August 17, 1909, the bank commissioner issued a certificate reciting that the Oswego State Bank had complied with the provisions of the act of 1909, and that its depositors were protected·by the bank depositors' guaranty fund.

For the long period of some fourteen years thereafter and until it became insolvent in 1924, the Oswego State Bank contributed to the support of the guaranty fund. It maintained the requisite amount of municipal bonds in the hands of the state treasurer to evidence its good faith—$500 worth of bonds for every $100,000 of its average deposits—as the statute provided, and it paid into the bank guaranty fund one-twentieth of one per cent of its average deposits eligible to guaranty less its capital and surplus, and thereafter from time to time it duly paid all assessments made by the bank commissioner to raise and preserve intact the bank depositors' guaranty fund; and the bank was still contributing to the maintenance of that fund in conformity with the statute when its doors were closed for insolvency in the spring of 1924.

During most of this long period of time, from 1911 until 1924, the Oswego State Bank was conducted without due regard to the regula-

tions of the general banking law. Its correspondence with the bank
commissioner's office shows that the bank's officers were persistent
offenders in the matter of making excess loans, loans to stockholders,
permitting its bills receivable to become past due and unpaid, and
permitting its customers to overdraw their accounts; and the bank's
officers paid little attention to the repeated requirements of the bank
commissioner that such delinquent management of the bank be cor-
rected and that its managing officers desist from such lawless prac-
tices. After some ten years of ineffectual protesting against such
corporate and managerial delinquencies, on December 18, 1923, the
bank commissioner gave written notice to the officers and directors
touching certain existing conditions in the bank which required their
immediate attention:

(1) That the money reserve which was down to 7.3 per cent should be raised
to the statutory minimum of 16.25 per cent within thirty days.

(2) Excess loans of $112,967.63 should be reduced to $9,000 within sixty
days.

(3) Elimination from assets of $277.94 of worthless loans at first meeting of
board of directors.

(4) Security should be gotten for loans amounting to $114,935.49 of ques-
tionable value, and that whatever of these loans remained unsecured after
sixty days should be charged off.

(5) Directions were given concerning overdrafts.

(6) Reductions ordered in credits to particular borrowers.

(7) Transfer of stocks and payment of dividends forbidden until bank con-
ditions corrected.

(8) Security required for $40,921.15 of slow paper.

(9) Get rid of certain papers and assignments carried as bills receivable,
and "hereafter handle no more of this class of stuff."

(10) Collect or get security on notes of Fisher $11,125.32, O'Connell $2,-
808.84, Oswego College $4,134.47, Hamilton $4,000.

Two days later, on December 20, 1923, the board of directors
acknowledged receipt of the foregoing notice and requirements, and
certified that on that day they had examined the bank in the pres-
ence of a deputy bank commissioner, and that its loans on personal
and collateral security were $420,716.53, and its loans on real estate
were $103,066.60, totaling $523,783.13, of which $277.94 was worth-
less, $40,921.15 slow paper but good, and $114,935.40 loans of ques-
tionable value which the directors believed "will eventually be paid
in full or in part, but about which there is some question at the
present time about realizing the full face value."

On January 8, 1924, the bank commissioner wrote at length to the
cashier finding much fault with the condition of the bank and its
management. The letter in part reads:

"Receipt is acknowledged of a report of an examination of your bank as made under date of Dec. 18, 19 and 20, by deputy commissioner, H. H. Olden.

"Mr. J. R. Stallings, the assistant cashier of your institution, . . . accompanied by your president, Fred Perkins, did call at the office . . . at which time we discussed numerous of the notes criticized quite thoroughly.

"I will have to frankly state that the examiner's report shows that your bank is in a very unsatisfactory condition indeed, and indicates that you have numerous unsatisfactory loans which no doubt will result in seriously heavy losses unless these loans are given close attention and strengthened by additional security. . . .

"*For a great many years, your bank has been violating the law promiscuously as regards excess loans and it appears that you and your board of directors have permitted the excess loans to come in the bank with but little regard for the Kansas banking laws, the requirements of examiners and instructions received from this office.* . . . [Italics ours.]

"It appears that the directors as well as the officers are responsible for these excess loans, and that they could not help but be aware that they had been in existence, because of the fact that your board holds weekly meetings. . . .

"At the time of Mr. Stallings' visit to the office, I advised him that it was my opinion that he is far too optimistic concerning the actual condition of your bank. He would not admit this, but nevertheless I believe he is too optimistic, and I think if you and Mr. Stallings and your board of directors will go over the paper carefully, and arrive at its true value, that you will likely be surprised at your actual condition."

On March 7, 1924, the bank commissioner dispatched the following letter to the bank:

"DEAR SIRS:

"Your commissioner has come to the conclusion after months of careful investigation and mature deliberation that in the interest of the depositors in the guaranteed banks and in fairness to the guaranteed bankers, the guaranty law must and will be strictly enforced.

"Having reached this conclusion and, acting under the strict mandate of section 11 of said law, . . . [copied in letter] you are hereby notified that from and after this eighth day of March, 1924, your bank is no longer under the depositors' guaranty law and your depositors are no longer protected thereby. Kindly remove the guaranty sign and erase any reference to guaranteed deposits from your windows, stationery or other places.

"As stated heretofore, we believe it in the interests of the depositors the guaranteed banks have the protection which the law affords them. A membership under the guaranty law is much to be desired, and we will be glad to go as far as the law will permit us toward reinstating you.

"CJP-U                                     Yours truly,

"Registered.                        CARL J. PETERSON, *Bank Commissioner.*"

The bank received the letter just quoted, but paid no attention to it. On April 18, 1924, the bank was closed for insolvency and the bank commissioner took possession. On that date the county treas-

urer had $18,230.73 of county funds on deposit. The bank commissioner declined to issue a certificate evidencing the county's right to reimbursement out of the bank depositors' guaranty fund. In justification of this attitude, counsel for the bank commissioner urge certain propositions which will be noticed in the order of their presentation.

First, it is suggested that the question whether deposits are protected by the bank depositors' guaranty fund does not depend solely upon the bank's compliance with the provisions of the bank guaranty act of 1909 and its amendments, but to be so protected not only must the bank have complied with that act but also with all the provisions and regulations of the general banking law. We cannot give assent to this contention. The general banking act governs the business of banking in this state. With its provisions all banks must comply. It is not optional. By that statute the state speaks with unqualified authority, and all banks and bank officers, directors, stockholders and everybody concerned must obey, under such penalties and consequences as the sovereign by its civil and penal statutes has imposed. The bank guaranty law, on the other hand, is merely the state's sanction and grant of permission to banks to participate in a voluntary arrangement for the security of depositors, and to create, manage and maintain a fund for the protection of depositors of the banks contributing thereto. Because of the quasi-public character of this voluntary system of furnishing security for bank depositors the state does authorize and require certain of its public officers to give their services, at public expense and without cost to the guaranty fund, to administer the bank guaranty law in the interest of those concerned. And while the guaranty law articulates closely in many particulars with the general banking law, and some of the provisions of the general act are adopted therein by reference, yet the guaranty act established an integral system dependent on itself for its operation.

The consequences of breaches of the general banking law are many, various and drastic, and may include cancellation of a bank's right to do business, a receivership, civil and criminal liabilities of bank officers and directors, and double liability of stockholders. The consequences which follow a breach of a statutory requirement of the bank depositors' guaranty law are quite different. Once admitted to participation in the assessments and benefits of the act, a failure of a guaranteed bank to conform to its terms is dealt with as follows:

"9-205. A penalty of fifty per cent of the amount of said assessment shall be added to the assessment of any bank not remitting as aforesaid within thirty days after receipt of notice of such assessment from the bank commissioner, and if any bank, which shall have been assessed and notified as aforesaid, shall fail to remit the amount of said assessment as herein provided, a sufficient amount of its bonds (together with the unexpired coupons) shall be immediately sold by the bank commissioner at public sale and the proceeds used to pay said assessment. Any balance remaining from the proceeds of such sale after the payment of such assessment shall remain to the credit of the bank in the depositors' guaranty. fund. The said balance, together with the remainder of the bonds (or cash in lieu thereof) shall be forfeited to the bank depositors' guaranty fund if the bank does not, within sixty days from default in payment of such assessments, remit the full amount of such assessments and penalty to date, and restore the amount of its bonds, or money pledged, as evidence of good faith. Upon the bank's failure to remit its assessments, according to the terms of this act, the bank commissioner shall immediately examine such bank, and if it is found in his judgment to be insolvent, he shall take charge of and liquidate said bank according to law. If said bank be found solvent, the bank commissioner shall cancel its certificate as a guaranteed bank, and cause to be displayed in its banking rooms, in a conspicuous place, continuously for six months, a card not smaller than twenty inches by thirty inches, and in large, plain type, reading as follows: 'This bank has withdrawn from the bank depositors' guaranty fund and the guaranty of its deposits will cease on and after ————.' The date on this card shall be a date six months after the first posting of such card. . . .

"9-211. If at any regular or special examination of a guaranteed bank it shall be found to be violating, or failing to comply with, *any provision of this act* [not some other act], the bank commissioner shall notify the bank and require it within thirty days to comply with such provisions; and if at the expiration of such time compliance has not been had, the bank commissioner shall cancel its certificate of membership in the bank depositors' guaranty fund as herein provided, and forfeit to said guaranty fund its bonds deposited with the state treasurer for the benefit thereof. . . ."

It must therefore be held that the fact that a bank has transcended or otherwise breached the provisions of the general banking law does not *ipso facto* cancel or nullify its right of participation in the assessments and benefits of the guaranty system.

The next question is whether the action taken by the bank commissioner on March 7, 1924, terminated the protection of depositors and forfeited their right to look to the guaranty fund for reimbursement. Defendant argues that the action of the bank commissioner effectively canceled the bank's certificate of membership in the guaranty system. And yet it has to be granted that whatever derelictions the Oswego State Bank and its officers had been guilty of, the one thing this bank had seemingly lived up to was the letter of the bank guaranty law. It had paid into the fund what it was re-

quired to pay; it had kept its pledged securities intact; it had paid · every assessment made by the bank commissioner. It is only for noncompliance with some provision of the guaranty act that the right of a participating bank to have its deposits guaranteed may be canceled. But if we should assume that the letter of the bank commissioner to the bank, of March 7, 1924, had the effect of canceling the bank's right to participate in the guaranty system, that cancellation did not cut off the right of depositors to protection. Their money, Labette county's money, had been deposited in the bank before its certificate as a participating bank was canceled. That cancellation certainly did not cut off whatever rights the depositors then had—on the strength of which they had intrusted this bank with their money. No notice was given of the bank's withdrawal from the bank depositors' guaranty fund, nor any specification of a date six months ahead when the guaranty of its deposits would cease as required by R. S. 9-205. Nor is it practical to formulate a rational basis for excluding from the protection of the guaranty fund the claims of depositors for their deposits made between March 7 and April 18 when the bank was closed for insolvency. The bank commissioner did not comply with the statutory steps to be taken to terminate the bank's relation to the guaranty fund. He did not cause to be displayed in the bank, in a conspicuous place, continuously for six months, a card not smaller than twenty inches by thirty inches, and in large, plain type, reading, "This bank has withdrawn from the bank depositors' guaranty fund and the guaranty of its deposits will cease on and after ———," a date six months ahead.

The point is suggested that depositors had notice because the bank commissioner had both notice and knowledge, and he was the agent of the depositors. That point is altogether too subtle. In a sense a public officer is the agent of the public, but only of the public *en masse;* he is not the agent of any individual member of the public. No individual depositor in this bank bore the relationship of principal to the bank commissioner, and no depositor is estopped to claim the protection of the guaranty fund on the theory that he must be held to have notice of what *his agent* the bank commissioner knew concerning the attempted revocation of the bank's certificate as a guaranteed bank. The present situation is altogether different from those cases where we have held that a depositor was not entitled to a claim on the guaranty fund where, by his own act, he had

accepted a rate of interest on his deposit or other option or privilege in excess of the maximum prescribed for the governance of guaranteed banks. Not in the remotest degree can any such fault or overreaching be traced to this plaintiff or those in like situation which would justify a denial of their claims upon the guaranty fund.

Another argument advanced against the plaintiff's claim is that where the general delinquencies of a bank have been gross and long continued, and the bank commissioner had full knowledge thereof, the bank depositors' guaranty fund *ought not to be held* for losses of depositors occurring through the failure of such a bank. That raises a question of policy rather than a question of law. From the first appearance of these bank guaranty laws some sixteen or eighteen years ago, the judicial attitude of the courts touching questions of policy—purely legislative problems—has been consistently that of friendly detachment and fair-minded neutrality. The courts with undeviating accord have held that the bank guaranty laws were a valid exercise of the police power and subject to no constitutional infirmity, but they have steadfastly refused to be drawn into the nonjudicial questions of their wisdom or expediency. On the latter point, the United States circuit court of appeals, in *Dolley v. Abilene Nat. Bank* (1910), 179 Fed. 461, 32 L. R. A., n. s., 1065, said:

"We have not considered the merits of the guaranty plan, whether practically beneficent, experimental, or illusory. Such matters are for the state legislature." (p. 466.)

In *Noble State Bank v. Haskell*, 219 U. S. 575, 55 L. Ed. 341-343, 32 L. R. A., n. s., 1062-1065, touching the Oklahoma bank guaranty law, the United States supreme court said:

"We fully understand the practical importance of the question, and the very powerful argument that can be made against the wisdom of the legislation, but on that point we have nothing to say, as it is not our concern." (p. 580.)

However, it may be logically reasoned that if all banks were conducted at all times in strict accord with the general banking law, bank failures would be very few. But experience has shown that more than a negligible percentage of banks are not so conducted, and it was to face that regrettable truth that the bank guaranty system was devised for the security of bank depositors. So designed and so purposed, it would be a rather curious conclusion for us to reach—that while the bank guaranty fund was created to protect the depositors against the consequences of reckless banking, yet

where the reckless banking has been particularly aggravated and long continued, the depositors who are victims of such banking are not entitled to the protection of the guaranty system. We have not had to consider any question quite like the present one, but some judicial exposition of the legislative purpose in enacting this statute is quite pertinent. In *National Bank v. Bank Commissioner*, 110 Kan. 380, 391, 392, 204 Pac. 715, it was said:

"It may be assumed the legislature was familiar with common forms of malfeasance of bank officers. . . . Deposits made in fact and in good faith are to be protected against the consequences of economic avalanche, financial panic, misfortune, poor banking methods, and dishonesty of bank managers. . . . If this operation of the bank guaranty law works public detriment instead of public benefit, the granting of relief lies with the legislature."

The grounds urged against granting the writ of mandamus cannot be sustained and judgment must be entered for plaintiff.

Writ allowed.